85 F.3d 628
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ADVANCED SOIL TECHNOLOGIES, INC., a foreign corporation,
Plaintiff/Counter Defendant-Appellant,
v.
GROW GROUP, INC., AUTOMOTIVE DIVISION, a foreign
corporation, Defendant/Counter Plaintiff-Appellee.
 No. 95-1090.
 United States Court of Appeals, Sixth Circuit.
 May 10, 1996.
 
 Before: KENNEDY and COLE, Circuit Judges; ALDRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Advanced Solid Technologies, Inc., ("AST") appeals from a jury verdict denying its claim for damages resulting from a breach of contract to remediate contaminated soil. AST claims the District Court erred when it denied its motion in limine to exclude evidence as to the amount of soil that could actually be extracted from Grow's cleanup site. AST argues that since its contract with Grow specified how tonnage would be measured--"actual tonnage will be determined by the weigh scale of AST's plant"--and that AST would be paid for each ton of soil remediated, Grow's proposed evidence estimating the amount of soil that had been excavated at its cleanup site was irrelevant and thus inadmissible. For the following reasons, we affirm.
 
 
 2
 * On August 18, 1993, AST brought a complaint against Grow for damages resulting from Grow's alleged breach of contract when Grow refused to continue paying AST to remediate chemical-laden soil located on Grow's property. AST's soil remediation process heats soils to a sufficient degree such that toxic chemicals are neutralized. AST sought roughly one million dollars for unpaid soil remediation services it provided to Grow.
 
 
 3
 Provisions eight and eight-a of the January 13, 1993 Proposal for Treatment of Contaminated Soil, which were incorporated into the contract, state that AST would provide the following services:
 
 
 4
 8. Thermal treatment of soils (Excluding Area B). Supply thermal equipment and operators, burner fuels, electricity, process shredding or screening, remoisturization, corrective action plan assistance, site safety and health plan, quality assurance/quality control, Soil Remediation Unit (SRU) supervision to ensure operations are within limits and capabilities of the SRU. AST reserves the right to dilute or mix the soils to ensure that Type B clean-up objectives are met while maintaining the safe operating parameters of the SRU.
 
 47.50 per ton
 
 5
 8a. AST shall charge Grow Group, Inc. a fee only once for the thermal treatment of contaminated soils unless said soil is contaminated with previously unknown constituents which are not remediated to Type B Clean-Up Criteria with once through treatment. Otherwise additional treatment necessary to meet Type B clean-up objectives will be at AST expense.
 
 
 6
 Moreover, the parties agree that there was an oral agreement affecting section eight-a that placed a twenty percent cap on the amount of treated soil AST could add to the wet untreated soil without deducting that amount from the tonnage figures it would charge Grow. However, they disagreed as to when the twenty percent cap applied. Grow officials testified that they understood AST to agree not to dilute the untreated soil by more than twenty percent ever; AST officials testified that the cap was contingent upon receiving sufficiently dry soil.
 
 
 7
 On October 13, 1994 AST filed a motion in limine to exclude Grow's evidence regarding the amount of soil excavated at its site and other similar evidence of the amount of soil needing remediation. AST argued that since the contract specified that AST would be paid on a per-ton basis and that tonnage would be determined on the basis of AST's scale, Grow's estimates of soil excavated at its site were irrelevant to the amount of soil AST could properly bill Grow for remediating. In response, Grow argued that although the contract specified that AST would bill Grow on a per-ton basis, the contract also specified that AST would not charge Grow for soil that was sent through the soil remediation unit more than once if in excess of the twenty percent referred to above.
 
 
 8
 On October 24, 1994 the District Court held a hearing on AST's motion in limine. After Grow admitted it intended to submit evidence that AST's scales did not accurately record the amount of soil actually taken out of ground at Grow's cleanup site, the District Court denied AST's motion, stating:
 
 
 9
 [Y]ou have a grain of a well-founded theory in there and I'm going to accept that part of your theory, and that is, ultimately, I certainly cannot submit to the jury a theory of damages that doesn't take into account the specified terms of the contract, but I'm not going to exclude evidence which tends to show that there was inappropriate mixing--that the material was passed twice.
 
 
 10
 Yes, ultimately, the scale is the ultimate measure upon which you were to be paid, but their theory is that you put things over that scale more than one time, that your mixed inappropriately and that, therefore, they got billed a lot more than they should have. So I think I understand quite clearly what my obligation is to the jury, and it may be that in, with more context in the course of the trial that I may find some evidence excludable, but for now, I think that their theory of defense fully supports the introduction of some evidence of what passed over, of why the numbers that were reflected on that scale were inappropriate under the contract, under other terms of the contract, so motion denied.
 
 
 11
 After a trial in which Grow introduced evidence of the amount of soil actually excavated at the site, the jury rejected AST's claim for unpaid services.[1] AST filed a timely notice of appeal.
 
 II
 
 12
 On appeal, AST argues that the District Court erred in denying its motion in limine because the contract expressly stated that tonnage would be determined by the weigh scale at AST's plant; since the contract specifies how AST will charge Grow for remediating soil, evidence of alternative measures of soil is irrelevant under FED.R.EVID. 401 and thus inadmissible under FED.R.EVID. 402. We review the District Court's interpretation of the contract between AST and Grow, the legal component of the District Court's decision to deny AST's motion in limine, de novo. Miller v. Field, 35 F.3d 1088, 1090 (6th Cir.1994). We would ordinarily review the District Court's denial of AST's motion in limine for abuse of discretion. Zamlen v. City of Cleveland, 906 F.2d 209, 215 (6th Cir.1990), cert. denied, 499 U.S. 936 (1991). However, since during trial AST did not renew its objection to the admission of the evidence it sought to exclude in its motion in limine, it has waived its right to challenge that evidence. Thus we review only for plain error. See United States v. Bonds, 12 F.3d 540, 569 (6th Cir.1993).
 
 
 13
 Under FED.R.EVID. 402, "[e]vidence which is not relevant is not admissible." The Federal Rules of Evidence define relevance as follows:
 
 
 14
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 
 
 15
 FED.R.EVID. 401. Grow sought to introduce testimony and estimates from soil experts, whose calculations on the amount of soil excavated at Grow's cleanup site suggested that AST had charged Grow for remediating considerably more soil than was actually excavated.
 
 
 16
 AST argues that the District Court's error in denying its motion in limine is explained by the Court's misinterpretation of section eight-a of the contract, which states:
 
 
 17
 AST shall charge Grow Group, Inc. a fee only once for the thermal treatment of contaminated soils unless said soil is contaminated with previously unknown constituents which are not remediated to Type B Clean-Up Criteria with once through treatment. Otherwise additional treatment necessary to meet Type B clean-up objectives will be at AST expense.
 
 
 18
 The District Court appears to have based its denial of AST's motion in limine in part on its belief that this section of the contract prohibited AST from charging Grow for any dry, treated soil added to wet untreated soil to ameliorate moisture problems: "I'm not going to exclude evidence which tends to show that there was inappropriate mixing--that the material was passed twice."
 
 
 19
 We agree with AST that, by itself, section eight-a does not prohibit AST from charging Grow for the dry soil mixed with wet soil to dilute the moisture in the wet soil. Section eight-a of the contract is concerned with additional remediation necessary to remove chemicals, not water, from the soil; it refers to soil that must be re-remediated more than once because the soil remediation unit did not remove enough of the chemicals to bring the soil up to a Type B standard. For soil that did not contain previously unknown constitutents, AST was not authorized to charge for subsequent treatments necessary when its machine did not adequately remediate the soil on the first run-through. Thus it is clear that this provision was concerned with achieving Type B standards rather than moisture problems with the soil. Indeed, the provision's exception for soil that contains previously unknown constituents, i.e. is worse than what the parties expected vis-a-vis its chemical content, provides further evidence that section eight-a was intended to place the financial burden on AST when its machine did not produce the right chemical results. But this section does not pertain to AST sending treated soil back through the machine when it added such soil to dilute wet, untreated soil. Thus, it cannot serve as the basis for Grow's introduction of soil evidence that conflicts with AST's tonnage figures.
 
 
 20
 Nevertheless, Grow's alternative soil measures are relevant to two other provisions in the agreement between Grow and AST. First, the parties agreed to place a twenty percent cap on diluting untreated soil to reduce the moisture in wet, untreated soil. The parties disagree about whether the twenty percent dilution cap was conditioned on AST receiving soil in reasonably good condition, but they do not truly dispute that there was an oral agreement limiting AST's right to charge Grow for dry, treated soil sent through the machine to reduce the moisture of the untreated soil. Because section eight-a was amended to place a twenty percent cap on soil dilution, Grow could properly seek to bolster its argument that it paid for too much soil because AST exceeded the twenty percent cap. Evidence of the discrepancy between Grow's estimates of how many tons of soil were excavated and how many tons of soil AST claims to have remediated make it more likely that AST exceeded the twenty percent cap. Thus such evidence was relevant.
 
 
 21
 Second, the contract specified that AST would verify its tonnage and ensure the accuracy of its scale. Grow presented evidence that there were occasions where AST's scale did not work and AST simply estimated the amount of soil that went through the machine. Grow also presented evidence that AST did not always reset its scale. Finally, Grow presented evidence that AST did not abide by its agreement to deduct soil sent through the machine at the start of each day, when the machine had not yet reached sufficient temperatures to remediate the soil. Evidence of the discrepancy between the amount of soil excavated and the tonnage AST claims went over its scales is also relevant under these parts of the agreement between the parties, for it makes it more likely that AST's measurements of tonnage were not accurate.
 
 III
 
 22
 Finding no plain error in the District Court's denial of AST's motion in limine, we AFFIRM.
 
 
 
 *
 The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 The jury also rejected Grow's claim for a refund. Grow has not cross appealed